# Exhibit 6

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:22-cv-11837-NMG

Montecalvo v. Cabela's Inc.
Assigned to: Judge Nathaniel M. Gorton
Demand: $5,000,000
Cause: 28:1332 Diversity-(Citizenship)

Date Filed: 10/27/2022
Jury Demand: Plaintiff
Nature of Suit: 380 Personal Property: Other
Jurisdiction: Diversity

**Plaintiff**

**Peter Montecalvo**
*individually and on behalf of all others*
*similarly situated*

represented by **Brian C Gudmundson**
Zimmerman Reed, LLP
1100 IDS Center
80 South 8th St
Minneapolis, MN 55402
612-341-0400
Email: brian.gudmundson@zimmreed.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carey Alexander**
Scott & Scott, Attorneys at Law, LLP
230 Park Avenue
Ste 17th Floor
New York, NY 10169
212-223-6444
Email: calexander@scott-scott.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael J Laird**
Zimmerman Reed, LLP
1100 IDS Center, 80 South 8th St.
Minneapolis, MN 55402
920-915-3328
Email: michael.laird@zimmreed.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel Kristine Tack**
Zimmerman Reed, LLP
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-341-0400
Email: rachel.tack@zimmreed.com

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ethan Samuel Binder**
Scott & Scott, LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
212-223-6444
Fax: 212-233-6334
Email: ebinder@scott-scott.com
*ATTORNEY TO BE NOTICED*

**Joseph P. Guglielmo**
Scott & Scott, LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
212-223-6444
Fax: 212-223-6334
Email: jguglielmo@scott-scott.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Cabela's Inc.**                    represented by   **Alan Y. Wong**
Shook Hardy & Bacon LLP
1 Federal Street
Suite 2540
Boston, MA 02110
617-531-1677
Email: awong@shb.com
*ATTORNEY TO BE NOTICED*

**Emyr T. Remy**
Shook Hardy & Bacon
One Federal Street
Ste 2540
Boston, MA 02110
617-531-1411
Email: remy@shb.com
*ATTORNEY TO BE NOTICED*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 10/27/2022 | 1 | COMPLAINT against Cabela's Inc. Filing fee: $ 402, receipt number AMADC-9562830 (Fee Status: Filing Fee paid), filed by Peter Montecalvo. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form)(Guglielmo, Joseph) (Entered: 10/27/2022) |

| 10/28/2022 | 2 | ELECTRONIC NOTICE of Case Assignment. Judge Nathaniel M. Gorton assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (Finn, Mary) (Entered: 10/28/2022) |
|---|---|---|
| 10/28/2022 | 3 | Summons Issued as to Cabela's Inc.. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Currie, Haley) (Entered: 10/28/2022) |
| 10/28/2022 | 4 | MOTION for Leave to Appear Pro Hac Vice for admission of Carey Alexander Filing fee: $ 100, receipt number AMADC-9564069 by Peter Montecalvo. (Attachments: # 1 Declaration of Carey Alexander ISO PHV Motion, # 2 Text of Proposed Order) (Guglielmo, Joseph) (Entered: 10/28/2022) |
| 10/28/2022 | 5 | MOTION for Leave to Appear Pro Hac Vice for admission of Ethan S. Binder Filing fee: $ 100, receipt number AMADC-9564081 by Peter Montecalvo. (Attachments: # 1 Declaration of Ethan S. Binder ISO PHV Motion, # 2 Text of Proposed Order)(Guglielmo, Joseph) (Entered: 10/28/2022) |
| 10/28/2022 | 6 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting ECF 4 and 5 Motion for Leave to Appear Pro Hac Vice as to Carey Alexander & Ethan Binder.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Warnock, Douglas) (Entered: 10/28/2022) |
| 10/28/2022 | 7 | NOTICE of Appearance by Carey Alexander on behalf of Peter Montecalvo (Alexander, Carey) (Entered: 10/28/2022) |
| 11/01/2022 | 8 | NOTICE of Appearance by Ethan Samuel Binder on behalf of Peter Montecalvo (Binder, Ethan) (Entered: 11/01/2022) |
| 11/10/2022 | 9 | SUMMONS Returned Executed Cabela's Inc. served on 11/4/2022, answer due 11/25/2022. (Guglielmo, Joseph) (Entered: 11/10/2022) |
| 11/18/2022 | 10 | MOTION for Leave to Appear Pro Hac Vice for admission of Brian C. Gudmundson Filing fee: $ 100, receipt number AMADC-9594087 by Peter Montecalvo. (Attachments: # 1 Declaration of Brian C. Gudmundson ISO PHV Motion, # 2 Text of Proposed Order) (Guglielmo, Joseph) (Entered: 11/18/2022) |
| 11/18/2022 | 11 | MOTION for Leave to Appear Pro Hac Vice for admission of Michael J. Laird Filing fee: $ 100, receipt number AMADC-9594105 by Peter Montecalvo. (Attachments: # 1 Declaration of Michael J. Laird ISO PHV Motion, # 2 Text of Proposed Order)(Guglielmo, Joseph) (Entered: 11/18/2022) |
| 11/18/2022 | 12 | MOTION for Leave to Appear Pro Hac Vice for admission of Rachel K. Tack Filing fee: $ 100, receipt number AMADC-9594120 by Peter Montecalvo. (Attachments: # 1 |

Declaration of Rachel K. Tack ISO PHV Motion, # 2 Text of Proposed Order)(Guglielmo, Joseph) (Entered: 11/18/2022)

| 11/18/2022 | 13 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 10 , 11 , 12 Motion for Leave to Appear Pro Hac Vice; Attorneys Brian C. Gudmundson, Michael J. Laird, and Rachel K. Tack added. <br><br> **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. <br><br> (Warnock, Douglas) (Entered: 11/18/2022) |
| --- | --- | --- |
| 11/18/2022 | 14 | NOTICE of Appearance by Brian C Gudmundson on behalf of Peter Montecalvo (Gudmundson, Brian) (Entered: 11/18/2022) |
| 11/18/2022 | 15 | NOTICE of Appearance by Michael J Laird on behalf of Peter Montecalvo (Laird, Michael) (Entered: 11/18/2022) |
| 11/18/2022 | 16 | NOTICE of Appearance by Rachel Kristine Tack on behalf of Peter Montecalvo (Tack, Rachel) (Entered: 11/18/2022) |
| 11/21/2022 | 17 | MOTION for Extension of Time to January 6, 2023 to File Response/Reply *to Plaintiff's Complaint* by Cabela's Inc.. (Attachments: # 1 Exhibit Ex. 1)(Remy, Emyr) Modified event type on 11/22/2022 (Warnock, Douglas). (Entered: 11/21/2022) |
| 11/22/2022 | 18 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered **ALLOWING** 17 MOTION for Extension of Time to File Answer, 1 Complaint Cabela's Inc. answer due 1/6/2023. (Warnock, Douglas) (Entered: 11/22/2022) |
| 01/06/2023 | 19 | MOTION to Dismiss *Plaintiff's Class Action Complaint* by Cabela's Inc..(Wong, Alan) (Entered: 01/06/2023) |
| 01/06/2023 | 20 | MEMORANDUM in Support re 19 MOTION to Dismiss *Plaintiff's Class Action Complaint* filed by Cabela's Inc.. (Attachments: # 1 Ex. 1)(Wong, Alan) (Entered: 01/06/2023) |
| 02/06/2023 | 21 | MEMORANDUM in Opposition re 19 MOTION to Dismiss *Plaintiff's Class Action Complaint* filed by Peter Montecalvo. (Guglielmo, Joseph) (Entered: 02/06/2023) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 02/15/2023 11:52:27 | | |
| **PACER Login:** | amberraak | **Client Code:** | 10758-0001 |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-11837-NMG |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PETER MONTECALVO, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>CABELA'S INC.,<br><br>     Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT - CLASS ACTION

Plaintiff Peter Montecalvo ("Plaintiff"), individually and on behalf of all others similarly situated, hereby files this class action complaint against Defendant Cabela's Inc. ("Defendant" or "Cabela's"), and in support thereof alleges the following:

## INTRODUCTION

1.    This is a class action brought against Cabela's for wiretapping the electronic communications of visitors to its website, www.cabelas.com.  Cabela's procures third-party vendors, such as Microsoft Corporation ("Microsoft"), to embed snippets of JavaScript computer code ("Session Replay Code") on Cabela's website, which then deploys on each website visitor's internet browser for the purpose of intercepting and recording the website visitor's electronic communications with the Cabela's website, including their mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited, and/or other electronic communications in real-time ("Website Communications").  These third-party vendors (collectively, "Session Replay Providers") create and deploy the Session Replay Code at Cabelas's request.

2.      After intercepting and capturing the Website Communications, Cabela's and the Session Replay Providers use those Website Communications to recreate website visitors' entire visit to www.cabelas.com.  The Session Replay Providers create a video replay of the user's behavior on the website and provide it to Cabela's for analysis.  Cabela's procurement of the Session Replay Providers to secretly deploy the Session Replay Code results in the electronic equivalent of "looking over the shoulder" of each visitor to the Cabela's website for the entire duration of their website interaction.

3.       Cabela's conduct violates the violates the Massachusetts Wiretapping Statute, Mass. Gen. Laws ch. 272 §99(Q), and constitutes an invasion of the privacy rights of website visitors.

4.      Plaintiff brings this action individually and on behalf of a class of all persons whose communications were intercepted in Massachusetts through Cabela's procurement and use of Session Replay Code embedded on the webpages of www.cabelas.com and seeks all civil remedies provided under the causes of action, including but not limited to compensatory, statutory, and/or punitive damages, and attorneys' fees and costs.

## **PARTIES**

5.      Plaintiff Peter Montecalvo is a citizen of the State of Connecticut, and at all times relevant to this action resided and was domiciled in Middlesex County, Connecticut.  Plaintiff has used his smart phone, iPad, and laptop to visit Cabela's website while being located in Massachusetts.

6.      Defendant Cabela's Inc. is a corporation organized under the laws of Delaware, and its principal place of business is 115 Cabela Drive, Sidney, Nebraska.  Defendant is a citizen of Nebraska.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class, including Plaintiff, is a citizen of a state different than Defendant.

8.      This Court has personal jurisdiction over Defendant because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in Massachusetts.  The privacy violations complained of herein resulted from Defendant's purposeful and tortious acts directed towards individuals while they were located within Massachusetts.  At all relevant times, Defendant knew that its practices would directly result in collection of information from individuals located within Massachusetts while those individuals browsed www.cabelas.com. Defendant chose to avail itself of the business opportunities of marketing and selling its goods in Massachusetts and collecting real-time data from website visit sessions initiated by individuals while located in Massachusetts, and the claims alleged herein arise from those activities.

9.      Cabela's also knows that many users visit and interact with Cabela's websites while they are physically present in Massachusetts.  Both desktop and mobile versions of Cabela's website allow a user to search for nearby stores by providing the user's "current location," as furnished by the location-determining tools of the device the user is using or by the user's IP address (*i.e.*, without requiring the user to manually input an address).  Users' employment of automatic location services in this way means that Cabela's is continuously made aware that its website is being visited by people located in Massachusetts, and that such website visitors are being wiretapped in violation of Massachusetts statutory and common law.

3

10. Pursuant to 28 U.S.C. §1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

### A. Website User and Usage Data Have Immense Economic Value

11. The "world's most valuable resource is no longer oil, but data."[1]

12. Earlier this year, Business News Daily reported that some businesses collect personal data (*i.e.*, gender, web browser cookies, IP addresses, and device IDs), engagement data (*i.e.*, how consumers interact with a business's website, applications, and emails), behavioral data (*i.e.*, customers' purchase histories and product usage information), and attitudinal data (*i.e.*, data on consumer satisfaction) from consumers.[2] This information is valuable to companies because they can use this data to improve customer experiences, refine their marketing strategies, capture data to sell it, and even to secure more sensitive consumer data.[3]

13. In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success.

---

[1] *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[2] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, BUSINESS NEWS DAILY (Aug. 5, 2022; updated Aug. 25, 2022), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.

[3] *Id.*

Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

14.   In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[5]   In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[6]

15.   OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [*i.e.* $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record.  A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[7]

### B.   Website Users Have a Reasonable Expectation of Privacy in Their Interactions with Websites

16.   Consumers are skeptical and are wary about their data being collected.  A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."[8]

---

[4]   Brad Brown, Kumar Kanagasabai, Prashant Pant & Gonçalo Serpa Pinto, *Capturing value from your customer data*, MCKINSEY (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[5]   *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, NO. 220 (Apr. 2, 2013), https://www.oecd-ilibrary.org/docserver/5k486qtxldmq-en.pdf.

[6]   *Id.* at 25.

[7]   *Id.*

[8]   Lance Whitney, *Data privacy is a growing concern for more consumers*, TECHREPUBLIC (Aug. 17, 2021), https://www.techrepublic.com/article/data-privacy-is-a-growing-concern-for-more-consumers/.

17.     Another recent paper also indicates that most website visitors will assume their detailed interactions with a website will only be used by the website and not be shared with a third-party they know nothing about.[9]  As such, website visitors reasonably expect that their interactions with a website should not be released to third-parties unless explicitly stated.[10]

18.     Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

19.     A recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[11]

20.     Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[12]

21.     Users act consistently with their expectation of privacy.  Following a new rollout of the iPhone operating software – which asks users for clear, affirmative consent before allowing

---

[9]     *CUJO AI Recent Survey Reveals U.S. Internet Users' Expectations and Concerns Towards Privacy and Online Tracking*, CUJO AI (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html.

[10]    Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, The Information Society, 38:4, 257, 258 (2022).

[11]    *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumerreports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[12]    Brooke Auxier et al., *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

companies to track users – 85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[13]

### C. How Session Replay Code Works

22. Session Replay Code, such as that implemented on www.cabelas.com, enables website operators to record, save, and replay website visitors' interactions with a given website. The clandestinely deployed code provides online marketers and website designers with insights into the user experience by recording website visitors "as they click, scroll, type or navigate across different web pages."[14]

23. While Session Replay Code is utilized by websites for some legitimate purposes, it goes well beyond normal website analytics when it comes to collecting the actual contents of communications between website visitors and websites. Unlike other online advertising tools, Session Replay Code allows a website to capture and record nearly every action a website visitor takes while visiting the website, including actions that reveal the visitor's personal or private sensitive data, sometimes even when the visitor does not intend to submit the data to the website operator, or has not finished submitting the data to the website operator.[15] As a result, website visitors "aren't just sharing data with the [web]site they're on . . . but also with an analytics service that may be watching over their shoulder."[16]

---

[13]    Margaret Taylor, *How Apple screwed Facebook*, WIRED, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

[14]    Erin Gilliam Haije, *[Updated] Are session recording tools a risk to internet privacy?*, MOPINION (Mar. 7, 2018), https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/.

[15]    *Id.*

[16]    Eric Ravenscraft, *Almost Every Website You Visit Records Exactly How Your Mouse Moves*, MEDIUM (Feb. 5, 2020), https://onezero.medium.com/almost-every-website-you-visit-records-exactly-how-your-mouse-moves-4134cb1cc7a0.

24.     Session Replay Code works by inserting computer code into the various event handling routines that web browsers use to receive input from users, thus intercepting the occurrence of actions the user takes.  When a website delivers Session Replay Code to a user's browser, the browser will follow the code's instructions by sending responses in the form of "event" data to a designated third-party server.  Typically, the server receiving the event data is controlled by the third-party entity that wrote the Session Replay Code, rather than the owner of the website where the code is installed.

25.     The types of events captured by Session Replay Code vary by specific product and configuration, but in general are wide-ranging and can encompass virtually every user action, including all mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text entry, and numerous other forms of a user's navigation and interaction through the website.  In order to permit a reconstruction of a user's visit accurately, the Session Replay Code must be capable of capturing these events at hyper-frequent intervals, often just milliseconds apart.  Events are typically accumulated and transmitted in blocks periodically throughout the user's website session, rather than after the user's visit to the website is completely finished.

26.     Unless specifically masked through configurations chosen by the website owner, some visible contents of the website may also be transmitted to the Session Replay Provider.

27.     Once the events from a user session have been recorded by a Session Replay Code, a website operator can view a visual reenactment of the user's visit through the Session Replay Provider, usually in the form of a video, meaning "[u]nlike typical analytics services that provide

aggregate statistics, these scripts are intended for the recording and playback of individual browsing sessions."[17]

28.     Because most Session Replay Code will, by default, indiscriminately capture the maximum range of user-initiated events and content displayed by the website, researchers have found that a variety of highly sensitive information can be captured in event responses from website visitors, including medical conditions, credit card details, and other personal information displayed or entered on webpages.[18]

29.     Most alarming, Session Replay Code may capture data that the user did not even intentionally transmit to a website during a visit, and then make that data available to website owners when they access the session replay through the Session Replay Provider.  For example, if a user writes information into a text form field, but then chooses not to click a "submit" or "enter" button on the website, the Session Replay Code may nevertheless cause the non-submitted text to be sent to the designated event-response-receiving server before the user deletes the text or leaves the page.  This information will then be viewable to the website owner when accessing the session replay through the Session Replay Provider.

30.     Session Replay Code does not necessarily anonymize user sessions, either.

31.     First, if a user's entry of personally identifying information is captured in an event response, that data will become known and visible to both the Session Replay Provider and the website owner.

---

[17]     Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, FREEDOM TO TINKER (Nov. 15, 2017), https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.

[18]     *Id.*

32.     Second, if a website displays user account information to a logged-in user, that content may be captured by Session Replay Code.

33.     Third, some Session Replay Providers explicitly offer website owners cookie functionality that permits linking a session to an identified user, who may be personally identified if the website owner has associated the user with an email address or username.[19]

34.     Session Replay Providers often create "fingerprints" that are unique to a particular user's combination of computer and browser settings, screen configuration, and other detectable information.  The resulting fingerprint, which is often unique to a user and rarely changes, are collected across all sites that the Session Replay Provider monitors.

35.     When a user eventually identifies themselves to one of these websites (such as by filling in a form), the provider can then associate the fingerprint with the user identity and can then back-reference all of that user's other web browsing across other websites previously visited, including on websites where the user had intended to remain anonymous – even if the user explicitly indicated that they would like to remain anonymous by enabling private browsing.

36.     In addition to the privacy invasions caused by the diversion of user communications with websites to third-party Session Replay Providers, Session Replay Code also exposes website visitors to identity theft, online scams, and other privacy threats.[20]  Indeed, "[t]he more copies of sensitive information that exist, the broader the attack surface, and when data is being collected . .

---

[19]     *Id.*; *see also FS.identify – Identifying users*, FULLSTORY, https://help.fullstory.com/hc/en-us/articles/360020828113 (last visited Sep. 8, 2022).

[20]     Juha Sarrinen, *Session replay is a major threat to privacy on the web*, ITNEWS (Nov. 16, 2017), https://www.itnews.com.au/news/session-replay-is-a-major-threat-to-privacy-on-the-web-477720.

. it may not be stored properly or have standard protections" increasing "the overall risk that data will someday publicly leak or be breached."[21]

37.     Recognizing the privacy concerns posed by Session Replay Code, in 2019, Apple required app developers to remove or properly disclose the use of analytics code that allow app developers to record how a user interacts with their iPhone apps or face immediate removal from the app store.[22]  In announcing this decision, Apple stated: "Protecting user privacy is paramount in the Apple ecosystem.  Our App Store Review Guidelines require that apps request explicit user consent and provide a clear visual indication when recording, logging, or otherwise making a record of user activity."[23]

**D.     Cabela's Secretly Wiretaps its Website Visitors' Electronic Communications**

38.     Cabela's operates the website www.cabelas.com.  Cabela's is an online and brick-and-mortar retailer for outdoor products, such as hunting gear and apparel, and camping equipment.

39.     However, unbeknownst to the millions of individuals perusing Cabela's products online, Cabela's intentionally procures and embeds Session Replay Code from Session Replay Providers on its website to track and analyze website user interactions with www.cabelas.com.

40.     One such Session Replay Provider that Cabela's procures is Microsoft.

---

[21]     Lily Hay Newman, *Covert 'Replay Sessions' Have Been Harvesting Passwords by Mistake*, WIRED (Feb. 26, 2018), https://www.wired.com/story/covert-replay-sessions-harvesting-passwords/.

[22]     Zack Whittaker, *Apple tells app developers to disclose or remove screen recording code*, TECHCRUNCH (Feb. 7, 2019), https://techcrunch.com/2019/02/07/apple-glassbox-apps/.

[23]     *Id.*

41.     Microsoft is the owner and operator of a Session Replay Code titled Clarity, which provides basic information about website user sessions, interactions, and engagement, and breaks down users by device type, county, and other dimensions.[24]

42.     Cabela's procurement and use of Microsoft Clarity's Session Replay Code, and procurement and use of other Session Replay Code through various Session Replay Providers, is a wiretap in violation Massachusetts statutory and common law.

**E.     Plaintiff's and Class Members' Experience**

43.     While in Massachusetts, Plaintiff visited www.cabelas.com on his computer, smartphone, and iPad to search for hunting and fishing gear.

44.     Plaintiff has consistently visited Cabela's website between 2010 and through 2021. Specifically, since 2019, Plaintiff visited the Cabela's website on his laptop, smart phone, and iPad, approximately one to three times each year while in Massachusetts.

45.     While visiting Cabela's website, Plaintiff fell victim to Defendant's unlawful monitoring, recording, and collection of Plaintiff's Website Communications with www.cabelas.com.

46.     Unknown to Plaintiff, Cabela's procures and embeds Session Replay Code on its website.

47.     During the website visits while located in Massachusetts, Plaintiff's Website Communications were captured by Session Replay Code and sent to various Session Replay Providers.

---

[24]     Jono Alderson, *An introduction to Microsoft Clarity*, YOAST (Nov. 11, 2020), https://yoast.com/introduction-microsoft-clarity/#h-what-is-microsoft-clarity.

48. For example, when visiting www.cabelas.com, if a website user looks at product, that information is captured by the Session Replay Code embedded on the website:



*Depicting information sent to one of the Service Replay Providers – Microsoft – through a Service Replay Code – Clarity – after viewing "LaCrosse Alpha Agility Waterproof Hunting Boots" while visiting* www.cabelas.com.

49. Similarly, when you select a store closest to you in order to view inventory and schedule in-store pick-up, that information is sent to Service Replay Providers:



*Depicting information sent to one of the Service Replay Providers – Microsoft – through a Service Replay Code – Clarity – after selecting "Harrisburg" as "My Store" on www.cabelas.com.*

50.     The wiretapping by the Session Replay Code is ongoing during the visit and intercepts the contents of these communications between Plaintiff and Cabela's with instantaneous transmissions to the Session Replay Provider, as illustrated below, in which only 34 milliseconds were required to send a packet of event response data, which would indicate whatever the website user had just done:



51. Session Replay Code operate in the same manner for all putative Class members.

52. Like Plaintiff, each Class member visited www.cabelas.com with Session Replay Code embedded in it, and the Session Replay Code intercepted the Class members' Website Communications with www.cabelas.com by sending hyper-frequent logs of those communications to Session Replay Providers.

53. Even if Cabela's masks certain elements when it configures the settings of the Session Replay Code embedded on its website, any operational iteration of the Session Replay Code will, by its very nature and purpose, intercept the contents of communications between the website's visitors and the website owner.

54. For example, even with heightened masking enabled, Session Replay Providers will still learn through the intercepted data exactly which pages a user navigates to, how the user moves

through the page (such as which areas the user zooms in on or interacted with), and additional substantive information.

55.      As a specific example, if a user types a product into Cabela's main search bar and initiates a search, even if the text entered into the search bar is masked, Session Replay Providers will still learn what is entered into the bar as soon as the search result page loads.  This is so because the responsive search results will be displayed on the subsequent page, and the responsive content generated by Cabela's will repeat the searched information back on the generated page. That information will not be masked even if user-inputted text is fully masked in a text field.

## CLASS ACTION ALLEGATIONS

56.      Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

**Massachusetts Class:**

All natural persons in Massachusetts whose Website Communications were captured in Massachusetts through the use of Session Replay Code embedded in www.cabelas.com.

57.      Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the Class, the judge to whom this case is assigned, and any immediate family members thereof, and the attorneys who enter their appearance in this action.

58.      **Numerosity:** The members of the Class are so numerous that individual joinder of all Class members is impracticable.  The precise number of Class members and their identities may be obtained from the books and records of Cabela's or the Session Replay Providers.

59.      **Commonality:** This action involves questions of law and fact that are common to the Class members.  Such common questions include, but are not limited to: (a) whether Defendant

procures Session Replay Providers to intercept Cabela's website visitors' Website Communications; (b) whether Cabela's intentionally discloses the intercepted Website Communications of its website users; (c) whether Defendant acquires the contents of website users' Website Communications without their consent; (d) whether Defendant's conduct violates Massachusetts Wiretapping Statute, Mass. Gen. Laws ch. 272 §99(Q); (e) whether Plaintiff and the Class members are entitled to equitable relief; and (f) whether Plaintiff and the Class members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

60.     **Typicality:** Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform prohibited conduct described above.  For instance, Plaintiff and each member of the Class had their communications intercepted in violation of the law and their right to privacy.  This uniform injury and the legal theories that underpin recovery make the claims of Plaintiff and the members of the Class typical of one another.

61.     **Adequacy of Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations.  Plaintiff has no interest that is antagonistic to the interests of the Class, and Defendant has no defenses unique to Plaintiff.  Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so.  Neither Plaintiff nor his counsel have any interest adverse to the interests of the other members of the Class.

62.     **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this

controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

63.     **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant intercepted Plaintiff's and Class members' Website Communications, then Plaintiff and each Class member suffered damages by that conduct.

64.     **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class members may be readily identified through Cabela's books and records or the Session Replay Providers' books and records.

## COUNT I
### Violation of Massachusetts Wiretapping Statute
### Mass. Gen. Laws ch. 272 §99(Q)

65.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

66.     Plaintiff brings this claim individually and on behalf of the Class.

67.     The Massachusetts Wiretapping Statute (the "Statute") prohibits any person who (1) willfully commits an interception, attempts to commit an interception, or procures any other person to commit an interception or to attempt to commit an interception of any wire or oral communication; (2) willfully discloses or attempts to disclose to any person the contents of any

wire or oral communication, knowing that the information was obtained through interception; (3) willfully uses or attempts to use the contents of any wire or oral communication, knowing that the information was obtained through interception. Mass. Gen. Laws ch. 272 §99(C).

68.     Any person who intercepts, discloses, or uses such communications or who so violates his personal, property or privacy interest, in violation of the Statute, is subject to a civil action for (1) actual damages but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1000, whichever is higher; (2) punitive damages; and (3) a reasonable attorney's fee and other litigation disbursements reasonably incurred. Mass. Gen. Laws ch. 272 §99(Q).

69.     "Intercept" is defined as any means to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication". Mass. Gen. Laws ch. 272 §99(A)(4).

70.     "Contents" is defined as "used with respect to any wire or oral communication, means any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication". Mass. Gen. Laws ch. 272 §99(A)(4).

71.     "Person" is defined as "any individual, partnership, association, joint stock company, trust, or corporation, whether or not any of the foregoing is an officer, agent or employee of the United States, a state, or a political subdivision of a state." Mass. Gen. Laws ch. 272, §99(B)(13).

72.     "Wire Communication" is defined as "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or

other like connection between the point of origin and the point of reception." Mass. Gen. Laws ch. 272 §99(B)(1).

73. "Intercepting Device" is defined as "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication other than a hearing aid or similar device which is being used to correct subnormal hearing to normal and other than any telephone or telegraph instrument, equipment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business; or (b) being used by a communications common carrier in the ordinary course of its business." Mass. Gen. Laws ch. 272 §99(B)(3).

74. Cabela's is a person for purposes of the Act because it is a corporation.

75. Session Replay Code, like that procured by Cabela's, is an "intercepting device" used for the "recording [of] a wire or oral communication" within the meaning of the Statute.

76. Plaintiff's and Class members' intercepted Website Communications constitute the "contents of wire[d] communication[s]" within the meaning of the Act.

77. Cabela's intentionally procures and embeds Session Replay Code on its website to spy on, automatically and secretly, and intercept its website visitors' electronic interactions communications with Cabela's in real time.

78. Plaintiff's and Class members' electronic communications are intercepted contemporaneously with their transmission.

79. Plaintiff and Class members did not consent to having their Website Communications wiretapped.

80. Pursuant to Mass. Gen. Laws ch. 272 §99(Q), Plaintiff and the Class members seek (1) actual damages but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1000, whichever is higher; (2) punitive damages; and (3) a reasonable attorneys' fee and other litigation disbursements reasonably incurred.

81. Cabela's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with Session Replay Code enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## COUNT II
### Invasion of Privacy – Intrusion Upon Seclusion
### Mass. Gen. Laws ch. 214, §1B

82. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

83. Massachusetts common law recognizes the tort of invasion of privacy. The right to privacy is also embodied by statute.

84. Plaintiff brings this claim individually and on behalf of the Class.

85. Plaintiff and Class members have an objective, reasonable expectation of privacy in their Website Communications.

86. Plaintiff and Class members did not consent to, authorize, or know about Cabela's intrusion at the time it occurred. Plaintiff and Class members never agreed that Cabela's could collect or disclose their Website Communications.

87. Plaintiff and Class members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

88.     Cabela's intentionally intrudes on Plaintiff's and Class members' private life, seclusion, or solitude, without consent.

89.     Cabela's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

90.     Plaintiff and Class members were harmed by Cabela's wrongful conduct as Cabela's conduct has caused Plaintiff and the Class mental anguish and suffering arising from their loss of privacy and confidentiality of their electronic communications.

91.     Cabela's conduct has needlessly harmed Plaintiff and the Class by capturing intimately personal facts and data in the form of their Website Communications.  This disclosure, and loss of privacy and confidentiality, has caused Plaintiff and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

92.     Additionally, given the monetary value of individual personal information, Defendant deprived Plaintiff and Class members of the economic value of their interactions with Defendant's website, without providing proper consideration for Plaintiff's and Class members' property.

93.     Further, Cabela's has improperly profited from its invasion of Plaintiff and Class members' privacy in its use of their data for its economic value.

94.     As a direct and proximate result Cabela's conduct, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

95.     Cabela's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with

Session Replay Code enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

### REQUEST FOR RELIEF

Plaintiff, individually and on behalf of the other members of the proposed Class, respectfully request that the Court enter judgment in Plaintiff's and the Class's favor and against Defendant as follows:

A.     Certifying the Class and appointing Plaintiff as the Class representative;

B.     Appointing Plaintiff's counsel as class counsel;

C.     Declaring that Defendant's past conduct was unlawful, as alleged herein;

D.     Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

E.     Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

F.     Awarding Plaintiff and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

G.     Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

H.     Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

I.     Granting such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the Class, demands a trial by jury of any and all issues in this action so triable of right.

Dated: October 27, 2022

*/s/ Joseph P. Guglielmo*
Joseph P. Guglielmo BBO #671410
Carey Alexander
Ethan S. Binder
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Fl.
New York, NY 10169
Tel.: (212) 223-6444
jguglielmo@scott-scott.com
calexander@scott-scott.com
ebinder@scott-scott.com

Brian C. Gudmundson
Michael J. Laird
Rachel K. Tack
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Tel.: (612) 341-0400
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.con
rachel.tack@zimmreed.com

*Counsel for Plaintiff*